FLORIDA TOWN IMPROVEMÉNT COMPANY, A CORPORATION UNDER THE LAWS OF THE STATE OF FLORIDA, PLAINTIFF IN ERROR, VS. GOTTLOB BIGALSKY, DEFENDANT IN ERROR.

1. The President of the United States had power in 1842 and 1849, by executive order, and without a special act of Congress authorizing him so to do, to reserve part of the public domain on the north end of Amelia island for a military reservation.

2. Public lands of the United States on the north end of Amelia island, reserved from sale for military purposes by executive orders of the President in 1842 and 1849, were effectually segregated from the public domain and passed beyond the control or jurisdiction of the General Land Office as a part thereof; and any action taken there thereafter, whether resulting in the issuance of a patent to an individual or in the certification of such lands to the State as swamp and overflowed under the act of Congress passed in 1850, had no binding force or effect, but was and is subject to attack whenever or wherever such proceedings should be asserted as the basis of title . .

3. Where documentary evidence on file in the General Land Office is produced proving that certain land sought to be recovered was lawfully reserved for military purposes, a court of law can in an action of ejectment adjudge a patent and a certification of such land as swamp and overflowed, made in defiance of such reservation under proceedings had in that office, void and refuse to give effect to them.

4. A Spanish grant in Florida, whether complete and perfect or not, was required by various acts of Congress to be presented for confirmation to the board of commissioners appointed to adjudicate upon such claims, or to be adjudicated by proceedings in the courts, and all grants not

so presented or adjudicated became barred by the limitation in those acts, and can not be now recognized as valid by the courts.

This case was decided by Division B.

Writ of Error to the Circuit Court for Nassau County.

The facts in the case are stated in the opinion of the Court.

*J. C. Cooper*, for Plaintiff in Error;

*H. H. Buckman* and *J. N. Stripling*, for Defendant in Error.

CARTER, P. J.

This cause was referred by the court to the late Supreme Court Commission for investigation, who reported that the judgment ought to be affirmed. In stating the principles of law controlling the main questions involved, we do so in the language of the opinion prepared by the commission, which we adopt as our own.

This was an action of ejectment instituted in the Circuit Court of Nassau county by the plaintiff in error against the defendant in error to recover possession of lots one and two of section fourteen, township three, north range twenty-eight, east, alleged to contain two hundred and sixty-seven acres of land, more or less, situated on Amelia island in Nassau county, to which plaintiff claimed title. Defendant pleaded "not guilty," and, in pursuance of a stipulation entered into by the parties, the case was tried by the court without a jury, whereupon

there was a judgment rendered for defendant, which is now brought before this court for review by writ of error.

Plaintiff sought to deduce title to lot one under the act of Congress of September 28th, 1850, granting swamp and overflowed lands within the limits of the State for certain purposes, the selection of this lot thereunder, December 17th, 1851, and the approval thereof to the State by the Secretary of the Interior on January 25th, 1853. Lot two was claimed under a patent to David L. Yulee, issued on September 5th, 1853, based upon a certificate of entry from the St. Augustine land office dated August 4th, 1851, which entry was based upon certificate No. 2, issued April 15th, 1851, in the matter of the grant to Fernando de la Maza Arrendondo. Plaintiff also introduced evidence seeking to establish a Spanish grant, including, it is claimed, nearly all of both lots, to one Don Juan McClure in 1813; and it undertook, by various conveyances introduced in evidence, to connect itself with these original sources of title.

Defendant introduced in evidence a certified copy from the General Land Office of an order of the President of the United States, dated February 9th, 1842, directing the Commissioner of the General Land Office to cause reservations to be made for military purposes of the following lands among others: "At the north point of Amelia island, Florida; fractional section eight of township three, north, range twenty-nine east, and fractional section eleven, and lots numbers one and two of fractional section fourteen of township three, north of range twenty-eight east:" and also a certified copy from that office of an order from the Secretary of War to the Commissioner of the General Land Office, dated March 23, 1849, directing that so much of the several tracts of land des-

ignated in the report of a board of engineers therewith transmitted, as was public land be reserved from sale until the completion of the surveys necessary for the location of required defences. The order further states "this reservation will supersede that heretofore made of the islands on the Florida coast, and so much of the reservation first made as is not included in any of the tracts enumerated in the enclosed report is relinquished by this department." The report of the board of engineers transmitted with that order contains a "list of lands recommended to be reserved for purposes of defence by the board of engineers on the coast of Florida." Among others the following are designated: "At Amelia island. All the public land on the north end of Amelia island." The defendant also introduced certified copies of other documents for the purpose of showing that in 1856 the officers of the War nad Land Departments discovered that the patent to Yulee and the selection of swamp and overflowed lands embraced lands that had been reserved for military purposes; that Mr. Yulee was requested to deliver the patent to lot two for cancellation, and that lot one was excluded from the patent for swamp and overflowed lands subsequently issued to the State. The defendant also introduced documentary and parol evidence for the purpose of showing that the United States had ever since that time regarded the lots as a part of the military reservation on the north end of Amelia island, now known as Fort Clinch Military Reservation, and had held actual or constructive possession of them as such. All of this testimony was objected to by plaintiff upon various grounds, but under the view we take of the case, it is unnecessary for us to review these rulings, as well as many others embraced in the numerous assignments of error, for the

reason that we find the patent and certification to be void without considering that evidence, and, therefore, the errors, if any, in admitting it were without injury to the plaintiff. If, as we hold, the patent to Yulee and certification to the State were void and conveyed no title, it is quite evident that plaintiff could not recover, and we reach the conclusion that they were void from a consideration of other evidence which he hold was properly admitted, withing giving any effect to the evidence here referred to. We shall confine our decision to the question presented in argument on behalf of plaintiff in error.

It is an elementary rule in actions of ejectment that the plaintiff must recover on the strength of his own title. If it appeared, therefore, from any evidence, properly admitted, on the part of the defendant that the plaintiff had no title to the premises which it sought to recover, the judgment of the court below was right and ought to be affirmed, even though the court may have erred in other respects, as such errors, if any were committed, could not be prejudicial to the plaintiff. In this view the only ruling on the admission of evidence that we find it necessary to consider is that complained of under the first assignment of error, relating to the admission in evidence of the certified copy of the order of the President of the United States, dated February 9th, 1842, purporting to set apart the premises claimed, as a part of a military reservation on the north end of Amelia island. Many objections were urged in the court below to the admissibility of this document, but in this court the objections are confined to the following: 1st. That nearly all of lots one and two were embraced in the Spanish grant to

McClure and could not, therefore, be reserved. We consider the question of the validity of that grant in another part of this opinion, and find that it is invalid.

2nd. That the order was subsequently revoked by the order of the Secretary of War of 1849. This question is considered in another connection, and determined adversely to the contention of plaintiff in error.

3rd. That the President could not by mere order, without authority of an act of Congress, reserve land for military purposes.

It is well settled that the President of the United States, by executive order, could reserve a part of the public domain for a specific lawful purpose, such as a military reservation: Grisar v. McDowell, 6 Wall. 363; United States v. Payne, 8 Fed. Rep. 883; Apis v. United States, 88 Fed. Rep. 931, text 940; Onderdonk v. San Francisco, 75 Cal. 534, text 538, 17 Pac. Rep. 678; Nevada Ditch Co. v. Bennett, 30 Oregon, 59, text, 103, 45 Pac. Rep. 472. See, also, Johnson v. Drew, 171 U. S. 93. Lands thus reserved were effectually segregated from the public domain and passed beyond the control of the General Land Office as a part thereof, unless it r. acquired jurisdiction thereover in some lawful manner As to such lands the General Land Office was wholly without jurisdiction, and any action taken there, whether resulting in the issuance of a patent, or the certification of such lands to the State as swamp and overflowed lands, had no binding force or effect whatever, but was subject to attack whenever and wherever it should be asserted as the basis of a title. Burfenning v. Chicago, St. Paul, M. & O. Ry. Co. 163 U. S. 321; Lake Superior Ship Canal Ry. Co. v. Cunningham, 155 U. S. 354; Doolan v. Carr, 125 U. S. 618, 8 Sup. Ct. Rep. 1228; Wilcox v. Jackson, 13 Pet. 498;

King v. McAndrews, 111 Fed. Rep. 860; United States v. Winona & St. P. R. R. Co., 67 Fed. Rep. 948; note 22 C. C. A. page 42, and cases there cited; Smelting Co. v. Kemp, 104 U. S. 636. It follows that there was no error in admitting in evidence the certified copy of the President's order, as it established a lack of jurisdiction over the subject-matter in the land department, and thus the invalidity of the patent and certification relied on as a foundation of title. The plaintiff in the court below objected to the introduction in evidence of the order of the Secretary of War to the Commissioner of the General Land Office of March 23, 1849, and an assignment of error is predicated upon such ruling. This assignment is, however, not argued and will not be considered.

The only other question we deem it necessary to consider is presented by the fifty-eighth assignment of error, asserting that the finding and judgment in favor of defendant were not supported by, but were contrary to, the evidence. There was a motion for a new trial embracing this among other grounds, and assignments of error are also based upon the exception taken to the ruling upon that motion. We shall consider this in two aspects: First, with reference to the patent and certification referred to above as a basis of title in plaintiff, and, second, with reference to the Spanish grant which is also relied on by it.

It having been shown that the property sued for was embraced in a military reservation set apart by the President in 1842, it is clear that neither the patent issued to Yulee nor the approval of the State's selection, both of which occurred in 1853, could serve as the basis for a claim of title on the part of plaintiff in error, unless the premises had in the interval been restored to the jurisdic-

tion of the land department. Plaintiff in error claims that this was accomplished in the following manner: A military board was appointed in September, 1848, to examine the military reservations theretofore made on the coast of Florida, and report "all the localities that should be reserved, giving limits to each reservation sufficiently definite to guide the land officers," their instructions stating that "in anticipation of the necessity for occupying certain points, islands, &c., on the coast of Florida as defensive sites, reservations have been made of the public lands to an extent that interferes possibly in some places with the progress of improvement and settlement of the coast." On March 12, 1849, this board prepared a report, which recommended the reservation, together with other property elsewhere on the coast of Florida, of "all the public land on the north end of Amelia island." On March 23, 1849, the Secretary of War forwarded a copy of this report to the Commissioner of the General Land Office, accompanied by a written communication requesting that reservations be made in accordance with the report until the completion of the survey necessary for the location of the required defences. This communication has already been referred to in the first part of this opinion. The contention of the plaintiff in error is that it was thereby left to the officers of the land department to determine whether or not the property in dispute fell within the description of "all the public land on the north end of Amelia island," and that their determination, evidenced by the approval of the selection of lot one as swamp and overflowed land and the issuance of a patent for lot two, is conclusive, being the determination of a matter within the jurisdiction of the land department. We do not think this contention can be sustained.

The question whether or not lands for which a patent has been issued constituted a part of the public domain, subject to disposition by the land department, is one affecting the jurisdiction of the department which may always be inquired into by the courts. Northern Pac. R. Co. v. McCormick, 72 Fed. Rep. 736, and authorities before cited; United States v .Coos Bay Wagon-Road Co., 89 Fed. Rep. 151. It is clear to us that the communication of the Secretary of War to the Commissioner of the Land Office, transmitting the report of the military board, which undertook to reserve "all the public land on the north end of Amelia island" was not intended to, and did not, release the premises in controversy from the character impressed upon them as part of a military reservation. Lots one and two fall fairly within the description of "all the public land on the north end of Amelia island," and we can not assume that there was any intention to relinquish them, from language which does not justify that assumption. Amelia island is a long island, extending north and south a distance of more than ten miles, and these lots are on the north end of the island. They had formerly been expressly reserved by accurate description, and the subsequent order we think by the language "all the public land on the north end of Amelia island," continued the former existing reservation. These documents in the General Land Office having reserved the lots for military purposes, it was not within the jurisdiction of the land department to convey and part of them to Yulee, nor did the act of Congress granting swamp and overflowed lands convey them to the State, nor authorize the land office to approve their selection as such. We freely concede the proposition that when lands within the jurisdiction of the land department have been

approved as swamp and overflowed under legislation of Congress authorizing the officers of that department to determine their character as such, that such approval is conclusive on collateral attack, but this principle does not apply to the present case for the very obvious reason that lot one was not within the jurisdiction of the land department, nor did the swamp and overflowed land act apply to it, because it had been reserved for military purposes, and could not, therefore, be selected as swamp and overflowed land under that act, even though it was in fact that character of land. Whether the want of jurisdiction in the land department over a particular piece of land can be proved by parol evidence, is a question not necessary to decide in this case, as the proof here consists of documentary evidence on file in the land office, *viz:* the orders of 1842 and 1849 reserving the lots of land for military purposes. Where such evidence is produced we are satisfied from the authorities cited that a court of law can in an action of ejectment adjudge a patent and certification of land made in defiance of a legal reservation of such land for a lawful purpose, void, and refuse to give effect to them. It follows, therefore, that no title is shown from the United States Government to either of these lots in controversy, and, that being so, it is unnecessary to consider the subsequent instruments which constitute links in the chain of title sought to be deduced from this original source.

There only remains as a basis for title in the plaintiff in error the alleged Spanish grant to Don Juan McClure, claimed to have been made in 1813, and that, we think is equally unavailing. There may be grave doubt whether or not the alleged grant was in fact a complete and perfect grant of title. It does not possess the usual attri-

butes of a grant of title.   In this connection we may repeat the language used by the Supreme Court of the United States in the case of Mitchell, Governor of Florida, &c., v. Furman, 180 U. S. 402, text 432: "The grant did not run in the name of the King; did not purport to make the grant as 'in absolute property;' did not assert the legal right to make such a grant; and the terms of the paper were consistent with a grant of possession merely, or, at the most, of a concession, which required a title in form to be subsequently issued. The report of the land commissioners of January 31, 1826, states: 'A royal title is the highest order of title known by any law, usage or principle, in the province of East Florida'. Titles of this description were designed to convey the fee simple to the grantee; they were usually made by the acting Governors of the province in the name of the King; they recited the grant to be in perpetuity, and also the specific metes and bounds of the land. This title may be said to correspond in character with that of a patent issued by our government. Concessions without conditions are understood to differ from a royal title only in this, that most of the latter recite the metes and bounds, whereas the unconditional concession, although definite in quantity and location of the land, is still subject to a survey; which, when made, was followed up by maturing the concession by a royal title. There is also a peculiarity in the phraseology of a royal title; in all the grants of this nature the legal right to grant the lands is asserted." The decree relied on as establishing the grant, after reciting the merit of the document presented, states that McClure having complied with the requisites to which are subjected those grants according to the certification of the witnesses of assistance, "we accede to his petition,

for that it must be dispatched the corresponding *title of possession* of the said land *in the terms to which the instructions formed for such grant are referred."* Whether the grant was or was not a complete one, there is no pretense that it was ever presented for confirmation to the board of commissioners appointed to adjudicate upon such claims, or that proceedings were had to have its validity adjudicated under the acts of Congress, and it was, therefore, barred by the limitation in the various acts of Congress requiring such presentation, or the initiation of proceedings for its adjudication. Mitchell, Governor of Florida, &c. v. Furman, *supra.*

We have not felt it incumbent upon us to consider other questions which might arise if plaintiff in error had shown a valid inception of title. It fails to do so, and that is the broadest ground upon which to rest an affirmance of the judgment.

The judgment is affirmed.